IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

CHRISTOPHER RUSHING,           )
                               )
            Plaintiff,         )
                               )
      v.                       )    Case No.
                               )    13-0119-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security, )
                               )
            Defendant.         )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Christopher Rushing seeks review of the final decision of the

Commissioner of Social Security denying plaintiff's application for disability benefits

under Title II of the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in

(1) finding that plaintiff's impairments do not meet or equal a listed impairment, (2)

ignoring the third-party statements of J. Veach and V. Starke, (3) not properly

considering the severity of plaintiff's traumatic brain injury, abilities and activities of daily

living, (4) assessing plaintiff's mental residual functional capacity, and (5) finding that

plaintiff can perform his past relevant work.  I find that the substantial evidence in the

record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore,

plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.    BACKGROUND

On January 6, 2010, plaintiff applied for disability benefits alleging that he had

been disabled since July 9, 2009.  Plaintiff's disability stems from a traumatic brain

injury that occurred when he was four years of age.  Plaintiff's application was denied

on February 12, 2010.  On July 5, 2011, a hearing was held before an Administrative Law Judge.  On November 15, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On December 10, 2012, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

>       Yes = not disabled.
>       No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, his father, and vocational expert Julie Harvey, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1988 through 2011, shown in both actual and indexed earnings:

| Year | Actual | Indexed |
|------|--------|---------|
| 1988 | $ 633.43 | $ 1,323.78 |
| 1989 | 1,641.90 | 3,300.66 |
| 1990 | 2,484.98 | 4,774.91 |
| 1991 | 5,177.61 | 9,591.40 |
| 1992 | 9,242.34 | 16,282.29 |
| 1993 | 9,111.47 | 15,914.86 |
| 1994 | 8,196.16 | 13,941.92 |
| 1995 | 7,827.92 | 12,802.36 |
| 1996 | 2,661.34 | 4,149.62 |
| 1997 | 13,306.97 | 19,604.55 |
| 1998 | 13,920.05 | 19,487.81 |
| 1999 | 12,779.87 | 16,947.14 |
| 2000 | 19,599.43 | 24,628.48 |
| 2001 | 16,133.23 | 19,800.51 |
| 2002 | 13,322.48 | 16,188.49 |
| 2003 | 15,803.05 | 18,744.48 |
| 2004 | 15,706.32 | 17,802.17 |
| 2005 | 11,069.38 | 12,103.60 |
| 2006 | 12,192.70 | 12,746.03 |
| 2007 | 10,065.17 | 10,065.17 |
| 2008 | 12,819.33 | 12,819.33 |
| 2009 | 7,384.19 | 7,384.19 |
| 2010 | 7,468.09 | 7,468.09 |
| 2011 | 0.00 | 0.00 |

(Tr. at 151-153, 157, 172-174).

**Disability Report - Field Office**

On October 18, 2005, plaintiff met with J. Veach of Disability Determinations in connection with a previous application for disability benefits which was denied (Tr. at 181-184). J. Veach observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing (Tr. at 183). J. Veach wrote,

"accompanied by wife and a friend who helped answer the questions, he had very poor memory and rather flat affect" (Tr. at 183).

**Function Report**

In a Function Report dated October 29, 2005 (in connection with a previous application that was denied), plaintiff reported that his typical day includes the following: "I wake up and go to work or clean the trailer or run errands.  After work I eat dinner and read.  I take my blood sugar readings 3 times  day.  I take my daily dose of Dylantin before I go to bed." (Tr. at 201).

Plaintiff's condition does not affect his sleep, he is able to perform all aspects of personal care with no difficulty, he needs no special reminders to take medicine or to take care of personal needs, he prepares his own meals every day (Tr. at 201-203).  He is able to clean, do laundry, do repairs, mow, use a weed eater, drive a car, go out alone, shop in stores for an hour at a time, handle a savings account, count change, and use a checkbook and money order (Tr. at 203-204).  Plaintiff reads, plays golf, goes bowling, goes deer hunting, and goes to church (Tr. at 205).  He has no problems getting along with family, friends, neighbors, or others; however, he did get fired from Tyson for arguing with a co-worker (Tr. at 206, 207).  His condition does not affect his ability to participate in social activities (Tr. at 206).  He "very rarely" has problems with changes in routine as long as he can write things down and have time to practice the changes (Tr. at 207).

Plaintiff can walk for three hours before needing to rest for about 15 minutes (Tr. at 206). Although he has trouble with verbal instructions, he can follow written instructions (Tr. at 206).

**Disability Report**

On January 12, 2010, plaintiff had a phone call with V. Starke in connection with his current application for disability benefits (Tr. at 219-221). V. Starke observed that plaintiff had difficulty with understanding, concentrating, talking, and answering based on the following: "Was submitted online, there were a lot of edits, NH was very slow at answering questions, would have to think about the question before he could answer, I believe his dad helped him complete, was not sure of some of the work history, very pleasant." (Tr. at 220-221).

**Function Report - Third Party**

On February 6, 2010, plaintiff's father completed a Function Report in connection with plaintiff's current application for disability benefits (Tr. at 235-242). Plaintiff's father reported that he spends several hours per week with plaintiff. Plaintiff's day was described as getting up, showering, having breakfast, going to the workshop, coming home for dinner, and watching television. Plaintiff's condition does not affect his ability to sleep, and he can perform all aspects of personal care without difficulty. He needs no reminders to take medicine or take care of his personal needs. He prepares his own meals daily. He is able to clean the house, mow the lawn, drive a car, go out alone, shop in stores, and count change. Although plaintiff's father reported that he is "unable" to handle a savings account, use a checkbook or money orders or pay bills, the reason

was that plaintiff's wife handles their finances.[1]  Plaintiff goes bowling, watches television, exercises, goes to church, goes to the gym, and he does not need anyone to remind him or accompany him.  He has no problems getting along with family, friends, neighbors or others.  Plaintiff's father was unable to estimate how long plaintiff can pay attention.  He follows written instructions fairly well but has difficulty with verbal instructions.  He gets along well with authority figures.

**Function Report**

In a Function Report dated February 6, 2010, plaintiff described his day as taking a shower, cleaning up, going to work, coming home to relax, reading, watching movies, walking the dog, exercising, and helping to clean the house (Tr. at 243-250).  His condition does not affect his ability to sleep, and he has no problem with personal care. He needs no special reminders, he prepares his own meals every day, he is able to clean, do laundry and mow.  He goes out every day, he is able to drive and he can go out alone.  Plaintiff is able to shop in stores and count change.  He does not pay bills or use a checkbook or savings account because his "wife does it."  His hobbies include reading, playing sports, exercising, watching movies, going to church and working out at a fitness center.  He has no problems getting along with family, friends, neighbors or others.  He is able to finish what he starts, he follows written instructions well and has a "fair" ability to follow verbal instructions.  He gets along with authority figures "very well." He does not handle stress well and changes in routine upset him "a little bit."

---

[1]During the hearing, plaintiff's father testified that plaintiff's wife is "challenged" (Tr. at 52).

**Missouri Supplemental Questionnaire**

In  Missouri Supplemental Questionnaire dated February 6, 2010, plaintiff reported that he was working at the Johnson County Workshop (Tr. at 251-253).  He had received no treatment since he filed his claim, and he had no upcoming appointments.  He plays video games and puzzles, and he uses a computer.  He has a valid driver's license and is able to drive.

**Report of Contact**

On February 11, 2010, Sue Higgins of DDS spoke to plaintiff's father (Tr. at 254). He said that plaintiff's seizures are controlled on Dilantin.  "Possibility of having one still exists but presently are controlled".  He stated that Vocational Rehabilitation helped plaintiff move into the general job market - "was okay for a while but now can't hold job and competition is too great due to the economy to find another one even tho [he] looks".

**Employment Letters**

Plaintiff's father asked the manager at the Sheltered Workshop in Johnson County and the store manager of McDonald's to write letters in support of plaintiff's application for disability benefits (Tr. at 267).  Robin Austin, plaintiff's manager at the Sheltered Workshop in Johnson County, wrote a letter to whom it may concern dated July 27, 2011:

> Chris is very reliable and attends work on a regular basis.  He has a very high understanding of job [f]unctions and very conscious of deadlines.

Chris take[s] direction from supervisors on a satisfactory level in regards to new job task[s].  In the event he has performed the job or one similar he tends to argue if the job order changes.

Chris has difficulties being a team player with other co-workers he feels he should be their boss.  Once Chris gets agitated he is unable to control his anger, his social skills with co-worker[s] are very limited. Chris enjoys being alone on breaks and would prefer to work in a department by his self [sic].

(Tr. at 268).

Lindsey Thomas, Store Manager at McDonald's,[2] wrote the following:  "While Christopher Rushing worked for McDonalds he did the following tasks, salad prep, lobby attendant, and dish washer. Chris did not take direction well from management and was easily frustrated."

## B.   SUMMARY OF TESTIMONY

During the July 5, 2011, hearing, plaintiff testified; his father Marvin Rushing testified; and vocational expert Julie Harvey testified at the request of the ALJ.

### 1.   Plaintiff's testimony.

At the time of the hearing, plaintiff was working in the Johnson County Enterprises sheltered workshop in Warrensburg (Tr. at 40-41).  Plaintiff makes brooms and he carries, throws, and bails cardboard for recycling (Tr. at 41).  He also uses a shredder to shred paper (Tr. at 42).

---

[2]Plaintiff's father indicated that the manager at McDonald's was reluctant to talk to him "at first . . . [but] I explained the purpose of the call and request for information.  I asked if they could provide information about Chris' duties and comparative performance. They were reluctant at first but after they realized I was not interested in pursuing legal action they agreed to talk and to provide a letter." (Tr. at 267).

In July 2009 plaintiff worked at McDonald's (Tr. at 42). He came back from a vacation and went back to his job at McDonald's (Tr. at 42). He left that job because people were "saying things" and he thought he was fired (Tr. at 42-43). He was able to do the job at McDonald's, and he performed it the same as the other employees there (Tr. at 43, 56-57). He was doing cooking, prep work, and traveling to different stores for pick ups and drop offs (Tr. at 46). He applied for and got the job at McDonald's without any special assistance, and he performed the job for over a year (Tr. at 43, 64-65). Plaintiff was able to keep up when he worked as a fast-food cook (Tr. at 66). The only problem he ever had was putting the hamburgers on the grill correctly -- he had to be shown once or twice and then he could do it (Tr. at 66). There was one person there who seemed to have a problem with plaintiff, but all in all he thinks he gets along OK with people (Tr. at 50-51). There was a person there, Lindsay, who was nice and helped plaintiff out; however, he was still able to work on days when she was off (Tr. at 55). When plaintiff left McDonald's he wanted to work out in the public rather than in a sheltered workshop job, but his only regular job after McDonald's was at a landfill and he left that job due to lack of work (Tr. at 44). After that he looked for work for a long time (Tr. at 44). His parents are on the board of the sheltered workshop and they helped plaintiff out by getting him a job there (Tr. at 45).

Plaintiff believes he is disabled because he is slow -- "it usually takes me time to think about stuff, think about what I have to do. I ask questions about that several times." (Tr. at 45). Plaintiff did not have a job coach at McDonald's or when he worked as a kennel attendant (Tr. at 60). He should have gone back to McDonald's and he

enjoyed doing that job, but he was not sure what people would say (Tr. at 60). He is still capable of doing the job at the kennel as well (Tr. at 60).

**2.     Plaintiff's father's testimony.**

When plaintiff was in high school he was in special education (Tr. at 53). After high school he worked for a sheltered workshop in Lafayette County, and plaintiff's father was on the board there at the time (Tr. at 53). Plaintiff decided he wanted to work in the competitive industry, so he got a job at ACE RC with a job coach (Tr. at 53). ACE closed up so he moved on and has done many jobs since then (Tr. at 43). In the jobs where plaintiff has been successful, he has had a job coach (Tr. at 53). His problem is that he thinks he knows how to do things and others at work do not agree, so there are conflicts (Tr. at 53).

Plaintiff worked at McDonald's for a year and believed he deserved a vacation, so he took one and thought it had been approved (Tr. at 54). He had not been approved, however, because the person who told him he could take a vacation was not the person in charge (Tr. at 54). He was let go because he had not shown up for work in two weeks (Tr. at 54).

After that he went to a job service, put in applications everywhere but he was not able to find a job and needed "some kind of money coming in" (Tr. at 54). Plaintiff's father suggested he go to the sheltered workshop, so he did (Tr. at 54). To be in the workshop "you have to be qualified by the state department of elementary and secondary education" (Tr. at 54). Once he was authorized for the workshop in Lafayette County after high school, "that doesn't change" (Tr. at 54).

Plaintiff was able to get the job at McDonald's on his own, but he had a friend there who helped him out and that is why that job lasted so long (Tr. at 55). She was not an official job coach, she was just someone who was nice at work (Tr. at 55).

Plaintiff filed the application for disability benefits because "he has been trying to get a job in the competitive market and he's not competitive anymore. With the market the way it is; for instance I know men who have retired from being a driver's license examiner for the highway patrol and now he does janitorial work at a school, which is the kind of work Chris would normally do. But Chris is not competitive in that market anymore. And he needs something to do and he needs some kind of income." (Tr. at 56).

### 3.    Vocational expert testimony.

Vocational expert Julie Harvey testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes janitor, DOT 381.687-014, heavy exertion with an SVP of 2; dishwasher, DOT 318.687-010, medium exertion with SVP of 2; nursery laborer, DOT 405.687-014, heavy exertion with an SVP of 2; grocery sacker, DOT 920.687-014, medium exertion with an SVP of 2; kennel attendant, DOT 410.674-010, medium exertion with SVP of 4 (semi-skilled); fast-food cook, DOT 313.374-010, medium exertion with SVP of 5 (skilled); landscape laborer, DOT 408.687-014, heavy exertion with an SVP of 2; and retail stocker, DOT 299.367-014, heavy exertion with an SVP of 4 (semi-skilled) (Tr. at 58-59). Plaintiff's work at the sheltered workshop most closely resembles a hand packager, DOT 920.587-018, medium exertion with an SVP of 2 (Tr. at 59).

The first hypothetical involved a person with no exertional limitations but who could perform no complex written activities and who would have a 10% reduction in maintaining pace (Tr. at 60-61). The vocational expert testified that such a person could perform all of plaintiff's past relevant work (Tr. at 61).

The second hypothetical was the same as the first except the person additionally would be unable to understand, remember and carry out complex instructions (Tr. at 61). The vocational expert testified that such a person could perform all of plaintiff's past relevant work except the fast-food clerk which is an SVP of 5 (Tr. at 61).

The third hypothetical was the same as the first except the person would have a 20% reduction in maintaining pace (Tr. at 61). The vocational expert testified that such a person could not work (Tr. at 61-62).

## C.    SUMMARY OF MEDICAL/SCHOOL/VOCATIONAL RECORDS

On July 23, 1985, plaintiff was 16 years of age and saw a neurologist to transition from his care by a pediatrician (Tr. at 281-282). The letter recounts that plaintiff was hit by a truck while riding a tricycle at age 4 1/2. He suffered a skull fracture and a year later he began to have seizures. The record states that plaintiff's last seizure was in 1975 (age 6) and that his seizures have been "well controlled by Dilantin." Plaintiff was on no medication other than Dilantin. He was described as "slow but friendly." His mental age was 12 years on the Kent EGY Rapid Screening Battery. Dr. Abrams concluded with the following:

This patient has a mild right hemiparesis[3] with clumsiness and posturing of the right arm.  He has mental subnormality of mild type and he has a well controlled seizure disorder.  I see no reason to change anything. We got a CBC,[4] SGOT,[5] and serum Dilantin level and will see him again in six months. He was given a prescription for Dilantin. . . .

On July 18, 1988, (when plaintiff was 19) Vicki Jones, a vocational rehabilitation coordinator prepared a work evaluation program report (Tr. at 284-288). She noted that plaintiff graduated from Odessa High School that  year and had not looked for work yet. It was noted that plaintiff's last seizure had occurred in 1975, when he was 6.  Plaintiff was given the BETA II to measure general intellectual functioning and he obtained an IQ score of 68.  During testing plaintiff was observed to be cooperative, he spoke softly with poor articulation and a flat affect.  He also exhibited very slow motor movements.

Ms. Jones noted that plaintiff was consistently punctual, he responded appropriately when conversation was initiated by co-workers or supervisors, he was accepting of supervision, he followed instructions, accepted job changes, and worked without complaining.  On a simple assembly type task, he performed at an "excellent production rate".  On those of a more complex nature requiring the use of judgment or independent decision-making skills, he worked at slightly below the shop average speed.  He demonstrated good work initiative and worked at a consistent pace.  He was

_____

[3]Weakness on one side of the body.

[4]Complete blood count, the number of red and white blood cells and total amount of hemoglobin in the blood.

[5]This enzyme level is used to check the function of liver, kidneys, heart, pancreas, muscles, and red blood cells. It is also measured to check on medical treatments that may affect the liver.

not easily distracted from his work.  Plaintiff was observed to have a consistently flat affect with "very little spontaneous expression of emotions".  It was recommended that plaintiff participate in training on job searches, interviews, and driving.

On November 8, 1988, on a Department of Elementary and Secondary Education form, plaintiff was noted to have "mental retardation" based on his application to work in a sheltered workshop upon graduation from high school (Tr. at 280).  The form, prepared when plaintiff was 19 years of age, also notes that plaintiff has "seizure disorder under control by medication".  A Vocational Rehabilitation counselor noted, "upon the basis of my evaluation and upon a review of previous training records of this candidate for employment, I feel that the above named applicant is unemployable in competitive industry but has sufficient work capacity to qualify as an employee in an extended employment sheltered workshop."  The form also states, "It is expected that this individual would have difficulty understanding and completing complex verbal or written instructions.  It is also anticipated that he could benefit from a low stress, highly structured work setting."

On March 29, 1991, when plaintiff was 22, a vocational assessment was completed and concluded with the following recommendation:  "Chris [should] be offered an opportunity to interview for competitive employment in an area he feels interest and competence in.  Chris [should] be given support services that include initial job coach training support, vocational counseling as might be indicated and follow along services to ensure positive outcome of placement." (Tr. at 291-293).

Fourteen years passed. On December 8, 2004, just before plaintiff's 36th birthday, he saw Douglas Anderson, M.D., for evaluation of a mood disorder (Tr. at 294). "He has a couple of people that work for him that are causing some difficulty for him. He is still sleeping OK at night. He is not having crying spells. He deer hunts as a hobby and he has been doing that. Notably he has a history of a seizure disorder. He takes Dilantin. He has gone for many years without a seizure and overall is doing well. Also of note, he is studying for driving qualifications to drive a tractor-trailer."

Plaintiff's affect was noted to be slightly flattened. "Speech and thought content are clear and coherent. He is a little bit slow on some of his answers regarding the circumstances of his seizure when he was young." Dr. Anderson recommended that plaintiff see a counselor and use exercise as stress management.

A year later, on November 29, 2005, in connection with plaintiff's previous application for disability benefits, Kenneth Burstin, Ph.D., found that plaintiff's mental impairment was not severe (Tr. at 304-316). He found that plaintiff has no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In support of his findings, Dr. Burstin wrote:

> 36-year-old cl. alleges disability due to seizures and poor concentration related to a head injury at age 4. Claimant worked SGA [substantial gainful activity] until 09/15/05 at which time he reported a reduction in hours by his employer, not related to any medical conditions. Claimant reports no psych treatment, no medications, no past hospitalizations. He reports he drives, does household chores, prepares meals, shops, and can count change. He reports he needs help with paying bills. Based on the claimant's medical records as well as the claimant's statement of function, a non-severe decision is appropriate.

17

Two and a half years later, on July 14, 2008, plaintiff was seen by Dr. Anderson for a check up on his seizures and refill on medication (Tr. at 325-327).  Plaintiff was observed to be alert; well groomed; not anxious, depressed, sickly or in acute distress. He was oriented times three.  He reported blood sugar readings somewhat high or low at home but had no symptoms such as dizziness, numbness etc.  Plaintiff's A1C[6] was normal.

On December 5, 2008, plaintiff was seen by Dr. Anderson for evaluation of diabetes (Tr. at 321-323).  Plaintiff's blood sugar was in the 300-400 range after he had eaten several chocolate cookies and drank 2 Dr. Pepper soft drinks.  His blood sugar "quickly returned to normal" the next day.  Plaintiff had forgotten to take his Dilantin, but he had had no seizures and was "doing well" on his current dose of Dilantin.  Plaintiff was described as being alert; well groomed; not anxious, depressed, sickly or in any acute distress.  He was oriented times three.  Dr. Anderson assessed abnormal glucose but told plaintiff to monitor his blood sugar at home now that it was normal (including his A1C).

On February 3, 2009, a physician at Central Family Medicine completed a fitness assessment medical release form for 24-Hour Fitness (Tr. at 328).  The form states that

---

[6]The A1C test is based on the attachment of glucose to hemoglobin, the protein in red blood cells that carries oxygen. In the body, red blood cells are constantly forming and dying, but typically they live for about 3 months. Thus, the A1C test reflects the average of a person's blood glucose levels over the past 3 months. The A1C test result is reported as a percentage. The higher the percentage, the higher a person's blood glucose levels have been.

plaintiff is free to participate in weight training, aerobic conditioning, and similar activities "without restrictions."

On April 15, 2009, plaintiff was seen by Dr. Anderson for a recheck on diabetes (Tr. at 318-319). Plaintiff reported his blood sugar readings had been in the range of 80-150 but with no dizziness. He also reported evening headaches. Plaintiff was observed to be alert; well groomed; not anxious, depressed, sickly or in any acute distress. He was oriented times three. His physical exam was entirely normal. Dr. Anderson ordered blood work. Plaintiff's A1C was 5.2% (normal was 4.4 - 5.8%).

July 9, 2009, is plaintiff's alleged onset date. There are no records in the file which post-date plaintiff's alleged onset date.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Jodi Levine entered an opinion on November 15, 2011 (Tr. at 16-27). Plaintiff's last insured date is December 31, 2014 (Tr. at 18).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 18). Although he worked after July 9, 2009, his work activity did not rise to the level of substantial gainful activity (Tr. at 18). Throughout 2010, plaintiff worked in a sheltered workshop which does not qualify as substantial gainful activity (Tr. at 18). Plaintiff did work full time for a brief time after his alleged onset date, and he earned minimum wage which, although not substantial gainful activity, does support a finding of an ability to perform competitive work (Tr. at 18).

Step two. Plaintiff suffers from status post traumatic brain jury, which is a severe impairment (Tr. at 19). Plaintiff's mental impairment does not cause more than minimal

limitation in his ability to perform basic work activities and is therefore non-severe (Tr. at 21).

Step three.  Plaintiff does not have an impairment or combination of impairments which meet or equal a listed impairment (Tr. at 19-22).

Step four.  Plaintiff retains the residual functional capacity to perform the full range of work at all exertional levels but with the following non-exertional limitations:  He is able to understand, remember and follow simple instructions but cannot perform complex written activities; and he has a ten percent reduction in his ability to maintain pace in the work environment (Tr. at 22-23).  With this residual functional capacity, plaintiff can perform his past relevant work as a janitor, dishwasher, nursery laborer, grocery sacker, kennel attendant, landscape laborer, and retail stocker (Tr. at 26).  All of these jobs are SVP 2 except the retail stocker and kennel attendant which are SVP 4 (Tr. at 26).

## VI.   LISTED IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that plaintiff's impairments do not meet or equal a listed impairment.

Plaintiff must establish that his impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  The Eighth Circuit has interpreted Listing 12.05c -- mental retardation -- to require a claimant to show each of the following three elements:  "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function."

<u>McNamara v. Astrue</u>, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting <u>Maresh v.</u>
<u>Barnhart</u>, 438 F.3d 897, 899 (8th Cir. 2006).

Although plaintiff alleges an IQ score of 68, he is unable to establish a physical
or other mental impairment imposing an additional and significant work-related limitation
of function.  Plaintiff's childhood traumatic brain injury is the cause of his low IQ, it is not
an additional impairment.  Plaintiff argues the ALJ failed to consider plaintiff's obesity;
however, plaintiff was never described by any doctor as being obese or even
overweight.  Furthermore, plaintiff never alleged any physical limitations due to obesity,
and no doctor ever found any physical limitations at all based on any impairment much
less obesity.  It is not enough for a claimant to point to obesity; he must actually show
that he had some actual work-related limitation or exacerbation due to obesity.  <u>Forte v.</u>
<u>Barnhart</u>, 377 F.3d 892, 897 (8th Cir. 2004) ("Although his treating doctors noted that
Forte was obese and should lose weight, none of them suggested his obesity imposed
any additional work-related limitations, and he did not testify that his obesity imposed
additional restrictions.").  Plaintiff's argument that the ALJ should have considered his
"partial inability to use his right side" is similarly without merit.  There is no evidence to
establish that this issue, which also stemmed from plaintiff's brain injury at age 4,
caused additional and significant work-related limitation of function.  See 20 C.F.R. pt.
404, subpt. P, App. 1, § 12.05c. The only relevant reference in the medical evidence is
an observation from 1985 stating plaintiff had "mild" weakness on his right side that
caused clumsiness and posturing of his right arm, but that he retained "reasonable
power in the hand and arm."  After that date, plaintiff engaged in substantial gainful

activity for many years and can point to nothing in the record suggesting that his condition worsened after his years of substantial gainful activity.

In determining the severity of plaintiff's mental impairment at steps two and three of the sequential evaluation process, the ALJ addressed each of the "paragraph B" criteria. See 20 C.F.R. § 404.1520a(e)(2). As the ALJ noted, besides maintaining substantial gainful activity for several years, plaintiff reported no problems with personal care, including monitoring his own blood sugar and taking his medication without reminders. Plaintiff reported taking care of pets, preparing daily meals, cleaning the house, doing laundry, driving, and performing home repairs and yard work. He lived with his wife, went shopping, attended church, exercised at a gym, bowled, played golf, and went deer hunting, and he consistently reported that he needed no help with these activities and could do them alone. Moreover, plaintiff stated he read, used a computer, and played video games and puzzles.

Ultimately, the ALJ found that plaintiff had no limitations in his activities of daily living; no limitations in his social functioning; only mild limitations in his concentration, persistence or pace; and no episodes of decompensation of extended duration. These findings suggested that plaintiff's mental impairment was not severe. See 20 C.F.R. § 404.1520a(d)(1). However, the ALJ gave plaintiff the benefit of the doubt and still categorized his brain injury as a severe impairment that did not meet a listing. The evidence supports the ALJ's severity finding.

Furthermore, although the ALJ pointed out that plaintiff alleged an IQ of 68, the ALJ did not find that the score was valid, she merely stated that plaintiff "alleged" the IQ of 68.

20 C.F.R. pt. 404, subpt. P, app 1, § 112.00C(10) provides as follows:

> IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.

However, an ALJ is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record. Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004).

> The listing for mental retardation, Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental retardation as, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." . . . We have emphasized in the past that IQ scores must be valid, that the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

Clay v. Barnhart, 417 F.3d 922, 928-929 (8th Cir. 2005). See also Christner v Astrue, 498 F.3d 790, 793-794 (8th Cir. 2007) ("[a]n ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior." quoting Muncy v. Apfel, 247 F.3d 728,733 (8th Cir. 2001)); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

In Johnson v. Astrue, 627 F.3d 316, 319-320 (8th Cir. 2010), the claimant had a performance IQ of 69, but he graduated in the top half of his class with As and Bs, and his daily activities and answers and abilities during his psychological tests were inconsistent with his IQ score.

In Cheatum v. Astrue, 388 Fed. Appx. 574 (8th Cir. (Mo) July 30, 2010), the claimant was able to work in semi-skilled and unskilled jobs for many years, perform activities of daily living, and drive. These factors are relevant as to whether the claimant had shown "deficits in adaptive functioning before age 22." Likewise, in Hines v. Apfel, 317 Fed. Appx. 579 (8th Cir. (Mo) March 25, 2009), the court noted that the claimant had performed semi-skilled work and had not sought treatment for cognitive deficits, nothing in the claimant's medical records indicated a suspicion of mental retardation, and the claimant's demeanor at the hearing were all inconsistent with the claimant's low IQ scores."

Conversely, in Douglas v. Astrue, 341 Fed. Appx. 257 (8th Cir. (Ar) July 9, 2009), the ALJ's finding that the claimant's low IQ scores were inconsistent with the record was reversed by the court. Although the ALJ had found that the claimant performed a semi-skilled job, the court found that the claimant had only been a "gopher" which was not semi-skilled work. In Christner v Astrue, 498 F.3d 790, 793 (8th Cir. 2007), the claimant dropped out of school in a low grade and after having been in special education classes. The court found that the claimant "likely met his burden of establishing onset before age twenty-two" because he had been unable to read or write, he had been unable to live independently, he was unable to keep jobs because he was

24

slow, and he had a limited work history as a result.  In <u>Maresh v. Barnhart</u>, 438 F.3d 897 (8th Cir. 2006), the court found that the claimant had established deficits in adaptive functioning before age 22 because the record showed he struggled in special education, dropped out in the 9th grade, had trouble with reading, writing and math, got into frequent fights with other children, and his employment history consisted of only a couple weeks of employment after which he was terminated.

In this case, the record establishes that plaintiff was able to perform a skilled job, semi-skilled jobs and unskilled jobs over many years.  Being able to work in semi-skilled and unskilled jobs for many years, perform activities of daily living, and drive was held to be inconsistent with the Listing in <u>Cheatum v. Astrue</u>, supra.

Although plaintiff was in special education for some of his classes, he graduated from high school, he reads as a hobby, he plays video games and puzzles, he can use a computer, he looked for jobs on his own, he secured employment on his own, he was able to perform jobs satisfactorily, and through his own testimony he is still capable of performing his old job at McDonald's and at the kennel -- his father testified that plaintiff just can't get those jobs anymore because the economy is bad and there is too much competition for jobs right now.

Here, as in <u>Hines v. Apfel</u>, supra, plaintiff performed semi-skilled work, he did not seek treatment for cognitive deficits, and nothing in his medical records indicated a suspicion of mental retardation -- the only reference in medical records was that plaintiff answered questions rather slowly.  Further, the actual IQ testing is not in the record, and it is unknown whether the test was administered by a psychologist.

Plaintiff's ability to work for a living for many years in both unskilled and semi-skilled jobs, coupled with his ability to drive, take care of himself, hunt, shop, bowl, go to the gym alone, go to church alone, shop, do yard work, do housework and some home repair -- according to Eighth Circuit case law -- preclude a finding that plaintiff has met this prong of the inquiry. All of these factors were discussed by the ALJ.

Because the evidence establishes that plaintiff did not have an impairment in additional to his cognitive impairment that resulted in significant work-related limitations, and because the substantial evidence supports the ALJ's finding that plaintiff's low IQ score was an allegation as opposed to a finding, plaintiff has not shown that his impairment meets or equals the criteria of Listing 12.05c.

## VII. THIRD-PARTY STATEMENTS

Plaintiff argues that the ALJ erred in ignoring the third-party statements of J. Veach and V. Starke, both employees of Disability Determinations. Plaintiff's argument is without merit.

J. Veach observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing. J. Veach wrote that plaintiff was "accompanied by wife and a friend who helped answer the questions, he had very poor memory and rather flat affect". This notation was made four years before plaintiff's alleged onset date, and he went on to earn at least $50,000 after that statement was made.

V. Starke spoke with plaintiff on the phone on January 12, 2010, and observed that plaintiff had difficulty with understanding, concentrating, talking, and answering based on the following: "Was submitted online, there were a lot of edits, NH was very slow at answering questions, would have to think about the question before he could answer, I believe his dad helped him complete, was not sure of some of the work history, very pleasant." Because V. Starke did not see plaintiff, there is no basis for the finding that he suffered from any impairment based on the fact that he appeared to need to think about the questions -- it is just as plausible that plaintiff was conferring with his father before answering each question for any number of reasons other than an inability to understand the questions.

Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 clarifies how the Social Security Administration considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.    Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.    Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.    Only acceptable medical sources can be considered treating sources.  20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).   "Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Id. quoting SSR 06-3p.

Plaintiff fails to explain how either of these employees of Disability Determinations had any special knowledge about plaintiff's ability to function.  The first one met with plaintiff years before his alleged onset date; therefore, that one-time observation is not even relevant. The second one never saw plaintiff face-to-face.  The person was unaware of what plaintiff was doing during the time he appeared to be thinking about his answers.

Plaintiff states that the ALJ's discussion regarding plaintiff's residual functional capacity is "completely silent as to the observations of Veach and Starke and how the ALJ might have considered them in forming the RFC." Interestingly, plaintiff himself never suggests what abilities the ALJ found plaintiff could do that the observations of Veach and Starke contradict. The ALJ found that plaintiff could not perform complex written activities and that he has a ten percent reduction in his ability to maintain pace in the work environment. No further limitations are either compelled or suggested by the observations of these two Social Security disability workers.

## VIII.   RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in not properly considering the severity of plaintiff's traumatic brain injury, abilities, and activities of daily living; in assessing plaintiff's mental residual functional capacity; and in finding that plaintiff can perform his past relevant work. Plaintiff argues that his traumatic brain injury is not a condition that improves as an affected person ages, and that his IQ is presumed to remain stable over time. This issue was discussed at length above. The only thing that has changed since plaintiff's ability to perform substantial gainful activity is the downturn in the economy, not any worsening of his condition. Plaintiff's allegation that his prior work history is irrelevant is circular -- "Where the Listing 12.05C criteria are met, the Commissioner 'may not rely upon previous work history to prove non-disability.'" -- except that in this case, Listing 1205c criteria are not met.

A claimant's residual functional capacity is the most he can do despite the combined effect of his credible limitations. 20 C.F.R. § 404.1545. It is the claimant's

burden to prove his residual functional capacity, and it is the ALJ's responsibility to determine the residual functional capacity based on all relevant, credible evidence in the record.  Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.").  The ALJ's job is then to weigh all the evidence.  Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006).

Plaintiff's daily activities have been described above.  His work history has been described above.  Plaintiff lost his most recent jobs due to a prolonged vacation at one and lack of work at another, not for any impairment-related reason.  Plaintiff's current manager at the workshop described him as reliable and conscious of deadlines, and she said he had a very high understanding of job functions.  Plaintiff testified that he was still capable of doing at least two of his past relevant jobs, and the undisputed evidence is that plaintiff's problem is the worsening economy making jobs scarce, not the fact that he is incapable of performing any job.

Based on the substantial evidence in the record, I find that the ALJ's residual functional capacity determination is supported by the record, and the ALJ's finding that plaintiff can perform his past relevant work is likewise supported by the record.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 28, 2014